# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**WILLIAM Q. TERRY,**
    **Petitioner,**

v.                                                   **Civil Action No. 5:11cv12**
                                                      **(Judge Stamp)**

**KUMA DEBOO, Warden, FCI Gilmer,**
**U.S. PAROLE COMMISSION,**
    **Respondent.**

## REPORT AND RECOMMENDATION

On January 26, 2011, the *pro se* petitioner, William Q. Terry, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. The petitioner is an inmate at FCI Gilmer, which is located in Glenville, West Virginia. In the petition, the petitioner challenges a decision of the United States Parole Commission (USPC). The undersigned conducted a preliminary review on March 17, 2011, and determined that summary dismissal was not appropriate at that time. Accordingly, a show cause order was entered. On April 14, 2011, the respondent filed a Motion to Dismiss, or in the alternative, Motion for Summary Judgment. On April 15, 2011, the petitioner filed a Motion seeking permission to add a respondent and change venue. On April 15, 2010 a Roseboro Notice was issued and on May 11, 2010 the petitioner filed his response. This matter, before the undersigned for a Report and Recommendation pursuant to LR PL P 2, et seq., is ripe for review.

## I. FACTUAL AND PROCEDURAL HISTORY

The petitioner was born on September 6, 1957. On May 21, 1977, he fatally shot a man named Othello Fox. On October 9, 1979, the Superior Court for the District of Columbia sentenced the petitioner to a term of 20 years to life for Murder 1 Whiled Armed in violation of DCC 22-2401

and a concurrent term of nine years for carrying a pistol without a license in violation of DCC 22-2304. (Doc. 15-3, p. 1). The petitioner became eligible for parole on October 25, 1999. (Doc. 15-3, p.2). The petitioner was denied parole on July 19, 2000 and continued for rehearing in February 2002, after the service of 28 months from his parole eligibility date. (Doc. 1-2, p. 1). On January 14, 2003, the petitioner was again denied parole and continued for reconsideration hearing in November 2007, after the service of 60 months from his rehearing date of November 19, 2002. (Doc . 1-2, p. 5). On December 17, 2007, the petitioner was denied parole for a third time and continued to a three-year reconsideration hearing in November 2010. (Doc. 1-2, p. 3). On December 22, 2010, the petitioner was denied parole for the fourth time and continued to a three-year reconsideration hearing in November 2013. (Doc. 1-8, p. 3). As of November 9, 2010, the petitioner had been in confinement for a total of 373 months. (Id.).

## II. CONTENTIONS OD THE PARTIES

The petitioner argues that the USPC committed an *ex post facto* violation by applying 1987 and 2000 guideline systems to his parole hearings. In addition, the petitioner argues that his parole reconsideration hearings were arbitrary and capricious violations of his Due Process rights. For relief, the petitioner asks this Court to rescind his latest reconsideration hearing, and a new hearing be afforded with full consideration of D.C. Code § 24-209.[1]

The respondent argues that the petitioner's has failed to state an *ex post facto* claim because

---

[1] DC ST § 24-209 is now found at § 24-409 and provides that: [t]he Board of parole created by § 723a of Title 18, United States Code, shall have and exercise the same power and authority over prisoners convicted in the District of Columbia of crimes against the United States or now or hereafter confined in any United States penitentiary or prison (other than the penal institutions of the District of Columbia) as is vested in the District Board f Parole over prisoners confined in the penal institutions of the District of Columbia."

2

his crimes predate the 1987 Guidelines. In addition, the respondent argues that the petitioner cannot show that the use of current guidelines substantially risked an increase in his punishment as compared to the pre-1985 regime.

In his response to the respondent's Motion to Dismiss or for Summary Judgment, the petitioner reiterates his claim that his parole decisions should be dictated by D.C. Code § 24-209. In addition, the petitioner expounds on his ex post facto claim.

### III. STANDARD OF REVIEW

**A. Motion to Dismiss**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint

3

need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Conley, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. (citations omitted), to one that is "plausible on its face," id. at 570, rather than merely "conceivable." Id. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I.DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir.2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir.2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

**B. Summary Judgment**

The Supreme Court has recognized the appropriateness of Rule 56 summary judgment motions in habeas cases. See Blackledge v. Allison, 431 U.S. 63, 80 91977). So too, has the Fourth Circuit Court of Appeals. Maynard v. Dixon, 943 F.2d 407 (4th Cir. 1991). Pursuant to Rule 56c of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Motions for summary judgment impose a difficult standard on the moving party; for it must be obvious that no rational trier of fact could find for the nonmoving party. Miller v. Federal Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). However, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242-252 (1986). To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson, 477 U.S. at 248. It is well recognized that any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Industrial Co. V. Zenith Radio Corp., 475 U.S. 574, 587-88 1986).

## IV. DISCUSSION

At one time, there existed a "Board of Parole....for the penal and correctional institutions of the District of Columbia," D.C. Code § 24-401.01(a) (2001), which determined an offender's suitability for parole. In 1997, Congress overhauled the District of Columbia's government, including the parole system through the National Capital Revitalization and Self-Government Improvement Act of 1997, Pub. L. No. 105-33, §11231(a)(1), 111 Stat. 712, 745, D.C. Code §24-1231(a)("Revitalization Act."). The Revitalization Act abolished the D.C. Board of Parole, and the USPC obtained jurisdiction of D.C. Code offenders to grant and deny parole. Accordingly, since August 5, 1998, the USPC has conducted the hearings and decided the requests for parole of all

persons convicted of violating the D.C. Code.[2] Prior to that date, the D.C. Parole Board conducted the parole hearings for D.C. Code offenders, applying guidelines it formally adopted in 1985, and published in the District of Columbia Municipal Regulations in 1987 ("1987 Regulations"). Upon assuming the D.C. Board's jurisdiction, the USPC began a process of revising the regulations for determining D.C.Code offenders' suitability for parole. See Sellmon, 551 F.Supp.2d at 72-73 (discussing revisions). The revisions were codified at 28 C.F.R. §§ 2.70-2.107 in 2000 ("2000 Regulations"). The 2000 Regulations specify that they are applicable to a D.C.Code offender, whose first parole hearing would occur after August 5, 1998. See 28 C.F.R. § 2.80(a)(5).

## A. 1987 Regulations

"The 1987 Regulations were adopted to 'structure the exercise of the paroling authority's discretion' and to promote 'increased consistency in parole release decisions and enhanced accountability of the Board' by making '**explicit** those factors that will be considered in each case." Sellmon at 554, *quoting* Report on the Development of the Paroling Policy Guidelines for the District of Columbia Board of Parole (emphasis in original). Under the 1987 Regulations, after serving his minimum sentence, a D.C.Code offender became eligible for parole.[3] The D.C. Parole Board would then determine the prisoner's suitability for parole by calculating a total point score (TPS) which ranges from 1 to 5. Based on the TPS score, the 1987 regulations lead to one of two

---

[2] Effective August 5, 2000, the USPC also was given the responsibility of supervising parolees and revoking parole. §11231(a)(2) of the Act codified at D.C. Code §24-131(a)(2).

[3] "[T]he justice or judge of the court imposing [a felony' sentence shall sentence the person for a maximum period not exceeding the maximum fixed by law, and for a minimum period not exceeding one-third of the maximum sentence imposed, and any person so convicted and sentenced may be released on parole...at any time after having served the minimum sentence. " D.C. Code § 24-403 (2001).

outcomes: "parole shall be granted" or "parole shall be denied. D.C. Mun. Regs. Tit. 28, §§ 204.19-.22 (1987) (repealed 2000). At an initial parole hearing, a prisoner with 0, 1, or 2 points "shall be" granted parole with varying degrees of supervision. Id. at § 204.19. For a prisoner with 3, 4, or 5 points, "[p]arole shall be denied at initial hearing and hearing rescheduled." Id. However, regardless of whether the 1987 Regulations indicated that a prisoner's parole should be granted or denied, the D.C. Board retained the discretion to reach a different decision if merited by "unusual circumstances." Id. at § 204.22.

**B. The 2000 Regulations**

Between 1998 and 2000, the Commission drafted new parole regulations and guidelines that it applied to any offender who received an initial parole hearing after August 5, 1998. See Sellmon 551 F.Supp.2d at 73. The Commission justified its revisions by explaining that its research demonstrated that "t]he point score system used by the D.C. Board of Parole ha[d] resulted in a high rate of upward departures from the guidelines based upon factors that should be included in the guidelines...." 63 Fed.Reg. 17771, 17772 (Apr. 10, 1998).

The 2000 Regulations establish the process the Commission follows to calculate the number of months a prisoner should serve in custody before he is suitable for parole. This multi-step process results in what is called the Total Guidelines Range, which is the "amount of time [a prisoner] may expect to serve with continued good conduct and ordinary program achievement." 65 Fed. Reg. 0663, 70664 (November 27, 2000). Until the prisoner has served a period of time equal to the bottom of his total guideline range, he is presumed to be unsuitable for parole. See 28 C.F.R. §§ 2.80(h), (I), & (f). Like the 1987 Regulations, the 2000 Regulations permit the USPC to deny parole to a prisoner who is presumptively eligible under "unusual circumstances." The 2000 Regulations provide

examples of "unusual circumstances" but do not limit the discretion of the USPC to depart on any basis that it classified as "unusual" except that it cannot have been "fully taken into account in the guidelines." 28 C.F.R. § 2.80(n).

## V. ANALYSIS

As previously noted, the petitioner alleges that the USPC violated his rights under the *ex post facto* Clause of the United States Constitution by using the 1987 and 2000 Regulations rather than D.C. Code § 204 in determining his parole eligibility. In addition, the petitioner argues that the decisions by the USPC were arbitrary and capricious.

Because the Constitution itself does not create any liberty interest in parole, such an interest must emanate from state law, or in this case, District of Columbia law. See Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 7 (1979). Courts have consistently held that the D.C. parole statute, which applies to D.C. Code offenders even after they were transferred to the jurisdiction of the USPC, does not create any liberty interest in parole. See, *e.g.*, McRae v. Hyman, 667 A.2d 1356 (D.C. 1995) (The District's parole scheme confers discretion to grant or deny parole and the scoring system creates no liberty interest overriding the exercise of that discretion); Ellis v. District of Columbia, 84 F.3d 1413 (D.C.Cir. 1996) (D.C. parole statute and regulations do not create any liberty interest in parole.) Furthermore, Congress committed decisions to grant or deny parole to the absolute, unreviewable discretion of the USPC. Garcia v. Neagle, 660 F.2d 983, 988 (4th Cir. 1981). Parole decisions are therefore not subject to arbitrary and capricious or abuse of discretion review under the provisions of the Administrative Procedures Act, 5 U.S.C. § 701(a)(2). Rather, judicial review is limited to a consideration of whether the Commission "exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations. Garcia at 988; see also Fardella v.

Garrison, 698 F.2d 208, 210 (4th Cir. 1982).

Accordingly, the USPC's exercise of its discretion in denying the petitioner parole and departing from the guidelines is unreviewable, and thus this Court is "without power to engage in judicial review of the Commission's substantive decision" to deny him parole, Garcia at 988. In other words, the substance or merits of the parole decision concerning the petitioner are beyond judicial review.

Turning then to the petitioner's alternate claim, the *ex post facto* Clause "forbids the Congress and the States to enact any law which imposes a punishment for an act which was not punishable at the time committed; or imposes additional punishment to that then prescribed." Weaver v. Graham, 450 U.S. 24, 28 (1981) (internal quotations omitted). The central concerns of this provision are "the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." Id. at 30. "To fall within the *ex post facto* prohibition, a law must be retrospective – that is, it must apply to events occurring before its enactment – and it must disadvantage the offender affected by it, by altering the definition of criminal conduct or increasing the punishment for the crime." Lynce v. Mathis, 519 U.S. 433, 441 (1997).

In this particular case, it is clear that the crimes for which the petitioner is incarcerated were committed prior to the adoption of either the 1987 or 2000 Regulations. The petitioner maintains that the USPC utilized the 1987 Regulations at his initial hearing and the 2000 Regulations at his subsequent hearings.[4] The petitioner claims that the retroactive application of these guidelines to

---

[4]It is not clear why the petitioner believes the 1987 regulations were used at his initial hearing. However, regardless of whether they were used, there would still be no *ex post facto* violation.

his 1978 conviction creates an *ex post facto* violation. The undersigned finds his argument to be without merit.

At the time the petitioner committed the offense for which he is still under sentence, parole eligibility was determined by a statute in effect since 1932, which provides in pertinent part that:

> in imposing sentence on a person convicted in the District of Columbia of a felony, the justice, the justice or judge of the court imposing such sentence shall sentence the person for a maximum period not exceeding the maximum fixed by law, and for a minimum period not exceeding one-third of the maximum sentence imposed, and any person so convicted and sentenced may be released on parole as herein provided at any time after having served the minimum sentence.

D.C. Code § 24-403(a) (2001). The parole authority operated pursuant to a statute, also in effect since 1932, which provides that:

> [w]henever it shall appear to the Board of Parole that there is a reasonable probability that a prisoner will live and remain at liberty without violating the law and remain at liberty without violating the law, that his release is not incompatible with the welfare of society, and that he has served the minimum sentence imposed or the prescribed portion of his sentence, as the case may be, the Board may authorize his release on parole upon such terms and conditions as the Board shall from time to time prescribe.

D.C. Code § 24-4-4(a).

When the petitioner was convicted, the Board had no formalized scoring system, but was required by regulation to consider factors such as the inmate's offense, prior history of criminality, personal and social history, physical and emotional health, institutional experience, and availability of community resources, when exercising its discretion to authorize parole. See 9 DCRR § 105. The Board's discretion under this regime has been described as "almost unbridled" Sellmon v. Reilly, 551 F.Supp2nd 66, 86, and "totally unfettered," Sellmon v. Reilly, 561 F.Supp.2d 46, 50 (D.D.C. 2008). Accordingly, under this statute, it is clear the Parole Board had discretion whether

10

to parole a particular individual, and there was no guarantee that parole would be granted at the earliest possible date, or any date thereafter. Therefore, the petitioner cannot show that use of the 1987 and/or 2000 guidelines substantially raised an increase in his punishment as compared to the regime used by the Board of Parole at the time he was convicted. Furthermore, it must be remembered that the petitioner was sentenced to a term of imprisonment of twenty years to life for murder. Therefore, any period of incarceration exceeding the minimum sentence of twenty years is not an increase in sentence because the petitioner ultimately faces a lifetime of incarceration. Therefore, in petitioner's case, in particular, the change in parole guidelines could not violate the *ex post facto* clause, as there can be no increase in punishment beyond the possible life sentence that was imposed.

## VI. Petitioner's Miscellaneous Motion

On April 15, 2011, the petitioner filed a document styled: "Petitioner Seeks Permission To Joinder Respondent In Alternative Request Venue Change." In it, the petitioner requests permission to join Eric Holder, the Attorney General pursuant to Rule 19(b) and Rule 20(a)(1) of the Federal Rules of Civil Procedure. In addition, the petitioner seeks to incorporate the Attorney General as the lead respondent and transfer venue to the Superior Court.

The undersigned notes that the initial pleading filed by the petitioner was styled a "Writ Of Habeas Corpus in Alternative A Federal Question for Declaratory Judgment." As the Court is well aware, a Writ of Habeas Corpus requires a $5.00 filing fee, while a complaint seeking Declaratory Judgment requires a $350 filing fee. The matter was docketed as a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241, which states in pertinent part that the writ of habeas corpus shall not extend to a prisoner unless he is in custody in violation of the Constitution or laws or

treaties of the United States. 28 U.S.C. § 2241(c)(3). "A court . . . entertaining an application for writ of habeas corpus shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted." 28 U.S.C. § 2243. The writ, or order to show cause shall be directed to the person *having custody of the person detained*. Id. (Emphasis added). Therefore, in a § 2241 habeas corpus case, the only proper party respondent is the Warden of the institution in which the petitioner is incarcerated. See Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484, 495 (1973). Accordingly, the petitioner's request to join the Attorney General is clearly inappropriate in a § 2241 petition.[5] Moreover, since a prisoner can only bring a Section 2241 claim in the district of incarceration, this Court lacks authority to transfer the petitioner's § 2241 petition to a jurisdiction wherein it could not have been originally filed.

## VII. RECOMMENDATION.

Based on the foregoing, the undersigned recommends that the respondent's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Doc.14) be **GRANTED,** the petitioner's Motion for Joinder, or in the Alternative, Request for Venue Change (Doc. 17) be **DENIED WITHOUT PREJUDICE** to his right to file a Complaint in a Court having proper jurisdiction and venue seeking a Declaratory Judgment, and petitioner's §2241 petition be **DENIED** and **DISMISSED WITH PREJUDICE**

Within fourteen (14) days after being served with a copy of this Recommendation, any party may file with the Clerk of the Court, written objections identifying the portions of the Recommendation to which objections are made, and the basis for such objections. A copy of such

---

[5]In hindsight, the Clerk of Court should have been directed to terminate the USPC as a respondent.

objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985) Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* petitioner by certified mail, return receipt requested, to his last know address as shown on the docket sheet. The Clerk of the Court is further directed to provide a copy of this Report and Recommendation to all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Filing in the United States District Court.

DATED: October 17, 2011

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE